The next case on the calendar, Caceres v. Bondi, has already been submitted on the briefs and record. U.S. v. Robert Alvin Justus is the next case for argument. You may approach, Counsel. Good morning. Good morning. Good morning, Your Honors. Vicki Marolt Buchanan, on behalf of Robert Justus. I would like to reserve three minutes, if that's possible. All right. I'll try to help you out, but keep your eye on the clock as well. Okay.  It's unusual for a defendant to testify in a murder trial. Justus testified because, as the trial court indicated, only he and Carrillo knew what happened in the van. On May 29, 2020, the night of the George Floyd protests in Oakland. Only Justus knew what he was thinking during the three hours he met with Stephen Carrillo until he drove the van across the intersection. As he soon discovered when he met Carrillo, Carrillo was a hypomanic, delusional, and paranoid, and had a van full of weapons. Justus' testimony was consistent with the FBI six-hour interview a few days before the incident. His undisputed testimony was that he did not intend to help Stephen Carrillo commit murder. Rather, he was trying to prevent Carrillo from shooting people. He had successfully— So, I mean, the jury heard that. The jury heard that theory and did not believe it. And I guess I struggle to see what—if you're arguing that the evidence was insufficient, I have a hard time seeing why a jury couldn't conclude that your client did have the required intent, given all of the facts and everything he did before, during, and after. I don't—well, I disagree because we don't know what he was doing. We don't know what—we do know what he was thinking. We have his testimony. There's only circumstantial evidence of what was going on. But because of the problems with what was before the court, it's impossible for the jury to know. They had so many—there were so many things going against him. But what appellate issue is your best argument? Because now, on sufficiency of the evidence review, the prosecutor gets every inference in its favor. So what's your best argument that the verdict should be overturned? Based on errors, one, in terms of the social media evidence and the duress instruction. But there is no direct evidence. So the social media evidence, that's one of the issues you raised in your brief. What is your argument with regard to the social media? It's hard to argue that they're not relevant to the issue of intent. Some of them are relevant, but a lot of them are inflammatory. The worst—the most damaging part in terms of the social media is when the judge came out and said the reason she was letting in a lot of the inflammatory evidence was the jury needs to understand who this person is in front of you. Now, this Court— But the social media posts are directly relevant to the issue of intent, which the prosecutor carries the burden of proving, right? I don't think they prove intent. I think they prove that he had some ideas, but it doesn't prove anything about I'm going to go out and murder someone. I'm going to go out and help someone murder someone. He had some beliefs. He had some ideas. He was liking things, but he never, ever, ever in his entire life had done anything violent, had followed through on anything. He didn't even belong to the Boogaloo movement. He was just spouting off, like a lot of people do on social media. Well, I mean, if you're saying the social media doesn't prove he had the intent, I agree with you. That may be true, but it was one piece of evidence, along with a whole lot of other evidence, the fact that he was with Carrillo in this van. We don't know exactly what they were saying to each other. He gave his version of that story, but he also got out of the van twice, I think, to walk around. When the van pulled out and the side door opened, the car continued to move forward. Afterwards, he didn't go and immediately report the incident. And so there's all kinds of other evidence that would suggest that he did intend to do it, and the social media evidence seems at least relevant to his intent, no? Well, I think that a lot of the reason and the purpose of the judge allowed the social media evidence is what I was just mentioning. She wanted the evidence before the Court so the jury would know who he is. This Court in United States v. Curtin specifically said it's improper to have evidence so that the jury knows who the defendant is. This type of evidence carries with it an inherent potential to see defendants simply as a bad person and then to convict because of who he is rather than what he did. The government amplified this in its closing argument. It argued that the weight of so many communications gives a better idea of who Robert Justice is and what he believed. Five times in its closing argument, it repeated that exact phrase, who he is and what he believes. For the jury to judge five of his actions, including the actions you talked about, Your Honor, getting out of the van, going back to the van, getting in the van in the first place, and then driving through the intersection. His affiliations, his interests, his online activity, you could describe it as who he is, but it's also about what he was doing and why on that day. That's where the jury was allowed to consider the evidence. I don't see you making any other arguments about instructions that were erroneous or that should have been given. All we're talking about is should the social media evidence have been included or excluded. No. The second, probably the most important argument is about the duress instruction. Right. But that doesn't – what does that have to do with the social media? As far as the social media is concerned, it was presented to the jury five times that they are to judge this person by who he is rather than what he did. The government wasn't asking to say did he actually intend it. I don't think anybody was telling the jury to judge him by who he is and not by what he did. That's it, right? It did five times. They said who he is and what he believes. They didn't say what he did, what he was thinking, what his intent was when he drove that van across the intersection. Further, he — But, Your Honor, isn't your argument on the matter of the social posting not so much under Rule 401 in terms of relevance, but in terms of whether or not the district court should have been more explicit in terms of a Rule 403 balancing test? Is that what you're arguing? Partially, yes. I mean, it was just overwhelming. But does the district court have to go explicitly and mention Rule 403 in terms of trying to balance the relevance under Rule 401 in terms of making an evidentiary decision? Is it required that the court has to actually explicitly go through Rule 403? I believe so. Under Curtin, I think they need to review for prejudice under 403. But it isn't a question of it being relevant under Rule 401. It's clearly relevant in terms of the state of mind. It has to do with whether or not there was sufficient balancing. Isn't that really the crux of your argument? Partially, yes. And also, it was brought in for an inadmissible purpose. You cannot say that having the jury focus on who he is is appropriate. You know, he had some kooky ideas. He wasn't a member of the Boogaloo Boys, but he had some strange ideas. And if anybody had their social media out there and they're posting these things, a lot of people were posting these things. They didn't go out and murder someone. I think you're focusing a little bit too much on insisting that the evidence is not relevant. You're kind of climbing an uphill battle there. It's relevant.  The question is whether the prejudice outweighs any relevance value it has, right? So can you move on to explaining why it's so prejudicial that it outweighs any appropriate value this information had? The case of Curtin is helpful in that regard because it's very similar. The sheer quantity of the evidence. The judge allowed them to put in 200 of these statements. And after two days of reading and publishing to the jury 80 of these statements, it was a long slog, as the government indicated. Well, as Curtin said when it remanded the case back to the court after it was reversed, it said, you know, please rethink the number of these. It's a problem. It's a prejudicial problem if you have that many things out there. It's overkill. And that's what happened here. It was overkill. Yes, there were relevant documents. But for two solid days, that's nothing what the jury heard. Those 80, I've got the entire volume three of the ER are those social media posts. And not everything he said was terrible. I mean, he didn't say terrible things. He liked terrible things. He didn't have any manifesto. He didn't write most of these things himself. He just liked memes. In fact, there's one of the postings that I noticed that he said he liked, he complained that they didn't have any memes, that all the memes were about guns. He didn't own a gun, by the way. He didn't want to touch a gun. But he said he was, as a libertarian, he was complaining that there weren't any memes on taxes or censorship or that sort of thing. So, you know, he was in a website. He got on the website at night. He went home. He worked. And then he came back, and he was on the website and other websites all the time. It seems to me, and you've made numerous references to Curtin, which is this Court's ninth opinion in 2007, I believe, correct? Yes. But in that case, the trial court relied on evidence summaries, whereas here the district court was clearly engaged in terms of conducting a balancing. Some of the posts were not allowed. I think at least three were disallowed, correct? That's true. And some of these posts actually had a sympathetic value. Did he not indicate some kind of suicidal tendencies at times in terms of difficulty with his loss of the custody of his children? There were all kinds of things that came out in these posts. There might have even been raised sympathy for him. Isn't that correct? That's correct. But also, in terms of Curtin, that was one of the reasons the Curtin court was concerned, because the judges read summaries. And it seems to me the question is, did the district court not take steps to try to balance this in some way? That's why I asked the earlier question as to whether or not the district court has to make specific reference to 403 in terms of conducting what appears to have been a balancing effort here. I believe they need to make something, because the judge did not balance the case. And she only balanced it by saying the jury needs to know who he is. In addition to the social media problem is that duress is not a defense argument. I mean, that Mr. Justice never intended to put in a duress defense. Part of what goes along with a duress defense is that you have to be — have committed the crime. And he did not want to put in a duress defense. But as to that, didn't the defense counsel at trial agreed to certain suggestions made by — the court agreed to certain suggestions made in terms of eliminating any risk of confusion? It almost seems like there was a waiver of any challenge to how the court instructed the jury. Well, the argument went on and on and on for months over this instruction. So it was well thought. There are — I cited the case law that it wasn't waived. I mean, you know, you finally have to give it — you have to say to the court, okay, let's try to make the best of this. But that doesn't concede that there was no error. Well, I think the actual — I could be wrong, but I thought the record reflects that the district court agreed to a change in the instruction from defense counsel, and defense counsel said another appellate issue resolved. We think that eliminates the risk of confusion in terms of the district court's effort in that regard.  That reduced the issue of confusion, but it doesn't get rid of the fact that the jury should not have been instructed on what was not — what he did not prove. I mean, it's a very bad instruction. It makes this very confusing. Yeah, some of the confusion is cleared up, but there's nothing in there. If you look at the — But didn't he — when Justice testified, he talked about being scared to leave, that he drove to the IRS building at Carrillo's direction and et cetera, and yet you don't think he's subselenial, essentially posturing a defense of duress? I'm sorry, I didn't — I mean, the point is essentially that his own testimony, Justice testified, it seems he's proffering a defense of duress without using the phrase duress and sort of dancing around it. He's talking about how he felt. But he never — he never promoted a defense of duress because he couldn't. There was — the fact that he walked out of the — out of — his worst fact is that he did — that he was able — he had an opportunity probably to get away if he hadn't gone back. Right. Twice. Well, the first time he said that he went to find parking, but he left all of his identification and everything in the van, so he went back to get that. That's the worst fact, but he has an explanation for it, and it makes sense. So that's — you know, that is — that is the worst fact. Just because you feel scared and because you feel threatened doesn't mean that the jury — the court is going to give a — this is not a duress instruction. The instruction is really bad. It's very substantial. Did you want to save a little bit of time, counsel? Yes, thank you. Good morning, and may it please the Court, Annie Shea for the United States. This Court should affirm for three reasons. First, the district court did not abuse its discretion in instructing the jury on duress. That instruction was warranted by the very evidence and defense that justice presented at trial, and its formulation was reasonable and legally correct. Second, the district court also did not abuse its discretion in admitting the social media posts, where such evidence was highly probative to prove intent and to rebut justice's defense. Is it — is it problematic in any way that the district court didn't explicitly weigh the 4-3 analysis, especially given the sheer volume of the social media posts that were submitted? Well, Your Honor, I would say — I would say, first of all, I think the record reflects a little bit differently. I think, as my friend on the other side has noted, there was significant litigation, pretrial litigation, on both the duress issue and the social media posts. And so if you look at the motions in Lemonnet that occurred from defense from the government's opposition, and then the district court actually went through each of those 198 social media posts. It considered each of them, and then it wrote a written order in which it actually granted in part the defense's motion. So you're relying on the course of litigation to say that the district court implicitly did the 4-3 weighing analysis? Or are you saying that there was an explicit weighing of the 4-3 analysis that I somehow missed in the record? Well, Your Honor, I think the entire issue was predominantly based off of 4-3. I think defense did concede and allow — But that was the context, so the district court implicitly did weigh the 4-3 analysis? Is that the argument?  And then there was, in the district court's oral ruling, there was also a statement about prejudice. She did say that. She didn't go through each of the factors necessarily, but I don't think that's required here when it's very clear that the entire discussion at length and extensively was about these very factors, whether or not this was far too remote or not probative enough, or there was going to be some danger of unfair prejudice. She found that these were just so directly relevant to the issues of intent, plan, motive, all the issues that were facts of consequence at trial. And she really carefully, I think, reached that conclusion that these would be admissible. I also want to point out defense originally agreed that, I think, in 94 of the posts that were noted were actually admissible, didn't object to those, objected to a number of others, obviously, over the course of litigation. But ultimately, the government only presented 73 of those. And I provided an Excel spreadsheet with, I think, the physical exhibit to the court with the government's filing that lays out all the admitted exhibits. The ER-417 chart? I do reference it, Your Honor, and the specific exhibit numbers are actually referenced in my brief. They range generally from exhibit 1008 until approximately 1138. Those are including both the Facebook posts and the communications between Justice and Mr. Carrillo. However, I was referencing there was an Excel spreadsheet that I provided with the physical exhibits that were in a CD that was transmitted to the court pursuant to a separate motion. Your Honor, to move to the duress instruction, because I do think that this is worth discussing, I said we should start with what Justice is not disputing. Justice is not contending that duress was an available defense here at trial. It seems that he no longer contends, at least according to his reply brief, that an instruction along the lines of duress is not a defense or available defense as a matter of law, such as one in Davidson, is also not problematic. So it seems his claim is essentially about maybe the formulation and the fact that the district court defined duress and just gave the elements of duress, which, again, he also agrees was legally correct. It matches the Ninth Circuit instruction and the Ninth Circuit law on the duress elements. So essentially the claim seems to be that the district court erred here by giving a legally correct instruction defining duress in a case where the evidence that Justice wanted to raise supports either both potentially a duress inference and the intent inference. And what the district court did here was it allowed Justice to present his duress evidence, essentially his narrative that, you know, he never had an intent. He showed up and only continued to help Carrillo because he was forced to and under fear of Mr. Carrillo. But by permitting that, it also appropriately gave a limiting instruction to make sure that the jury was not going, making or drawing an impermissible duress inference from that same evidence, but could draw a lack of intent inference from that evidence that Justice was allowed to present. It's my understanding that there was one language, the record reflects language was added to the boilerplate Ninth Circuit instruction as a result of a specific request that the defense counsel asked to add the phrase, while duress is not a defense to the crimes charged here, the government must still prove beyond a reasonable doubt that the defendant acted with the intent to help commit the charged crime. And that is, in fact, added to the boilerplate, correct? That's not in the form instructions, but it was added by defense counsel's request. Yes, Judge Bennett, you are correct in that. I would also add to that point that this duress instruction and the way it was formulated was a result of, again, as my friend notes, significant litigation and discussion. And there were several iterations as they were working through what this looked like, and defense had significant input in this. And the court eventually gave essentially what the defense counsel wanted. There was, in the court's original proposal, language along the lines of here the parties agree that the evidence cannot be used to support a defense of duress because duress is not a defense of the particular crimes charged here. That was one way that comes from ER 2632. There was an instruction also had a sentence about how defense contends that there was no intent here and how the defendant's mental state should not be confused with duress. That comes from ER 2601, 2604, and 2607. Again, there was significant back and forth. And the fact is defense counsel provided a lot of input into this formulation. It was considered and largely adopted by the court. And then at the end of this, the defense counsel said, oh, another appellate issue resolved. It seems to be, and again, I want to be clear that we did not contend that the – there's two aspects to the duress challenge, right? There's the giving of instruction, which we don't believe was waived, that was preserved, and then there's a formulation of instruction. And it's difficult based off – to really ascertain exactly what justice is raising at this point or actually challenging because it seems based off of their Davidson concession that some sort of instruction about this not being an available defense as a matter of law is appropriate. However, with regard to the latter point, the formulation, it should be at least  Well, as I understand it, defense is saying this instruction as a whole is confusing. I think the concern is that even though he is not entitled to present a duress defense, his statements about why he was acting the way he did under essentially a threat would not be considered to negate intent. And so I take it the government's response is that the defense got what it wanted and that distinction between not having a duress defense available but yet having all of that evidence that the defense wanted to be considered, to be considered for purposes of negating intent, that that was essentially made clear to the jury with the clarification that the defense asked for and the court accepted and gave the jury that instruction, right? I think the part about the government still has to prove beyond a reasonable doubt that the defendant acted with the intent and also that the same evidence can be used to argue different factual conclusions. And then at closing, each side is entitled to make whatever arguments they wanted to make with the evidence that came in. Yes, Your Honor. I would say as far as the risk of confusion, I think, again, that is a formulation or a language question, whether or not this particular instruction here really led to any confusion. And so I would first look at the actual expressed language. There's nothing in this actual instruction, again, that it's just the same. Well, that's what I'm saying. Any risk of confusion, if there was a risk, is essentially resolved with the clarification the defense asked for and got. Yes, Your Honor. I would agree with that. Yes, Your Honor. Your Honor, briefly with evidentiary sufficiency, I think the court well recognizes the deferential standard for to the jury when it comes to evidentiary sufficiency. Again, there was more than sufficient evidence here for a rational juror to conclude that Justice willfully participated and had the intent to help Carrillo commit the shooting and murder and attempted murder of these federal security guards. I just briefly want to just point out the evidence in this case was not just a social media post. This was a murder that was captured on camera. And in addition to that, there was extensive surveillance footage of Justice's actions before and during this particular murder. And in addition to that, there were his communications with Carrillo leading up to and after, as well as his conduct after. All of that is very strong circumstantial evidence of intent here. And under the deferential evidentiary sufficiency standard, this Court should affirm. Your friend on the other side emphasized points maybe made by the Court about social media posts show who he is, who Justice is. Do you want to address? I don't know if there was one comment that the Court made or more than one, but maybe you want to address that point. Yes, Your Honor, absolutely. These were comments that were made, again, during the closing argument of the government. And I would ask the Court to look at the argument in the context that it was given, in the full argument, that every single time that phrase was used, it was with who he is and what his state of mind was the night that this happened or what he believed. And those issues were certainly facts of consequence at this trial because, again, one, because of the intent element here requires, you know, advanced knowledge and that he acquired that knowledge before he even participated or actually acted in this crime. That comes from the instructions on the elements. But, two, it was especially of consequence at this trial based off of Justice's defense and his narrative that he put forth. And so — And that narrative included testimony as to constant pressure from Carrillo, correct? Yes, Your Honor. He said several times, and Judge Gonzales-Rogers below noted this on the record, that he, throughout his testimony — Excuse me. — said several times about how fearful he was of Carrillo, which is why he did what he did. Again, his narrative was that he showed up that night. He wanted to attend these George Floyd protests, had met Carrillo online a day or two before, was just getting a ride and found himself in a car with a crazy, dangerous person who he was very afraid of, and he had no intent. So the social media posts here and all the evidence that the government put forth and had to put forth to meet its burden was necessary and appropriate and proved his intent beyond a reasonable doubt. If there are no further questions — Thank you.  Thank you. Thank you. With regard to the duress instruction and the arguments of counsel, the counsel from the very beginning said he didn't think there should be a duress instruction, but pretty early on said, okay, we can have a duress instruction, and here's what I propose. While there isn't a defense of duress, the jury can consider the evidence for state of mind. That's very simple. That would have taken care of everything that the judge was concerned about, that the jury would assume there was some duress by saying, in other words, In the Davidson case cited by the government, the court gave almost an identical instruction. That would have been fine. The trial counsel consistently and thoroughly kept saying, don't put in these elements. It's confusing. And not only is it confusing, it somehow leads the jury to think that there was something wrong with the way that he testified at trial. And so they're saying, so just ignore him. There's no defense of duress because maybe he wasn't scared. Maybe he didn't prove he was scared. Or maybe he didn't prove that he, that Carrillo even threatened him to begin with. Aren't you reading, I mean, it seems to be reading a lot into the instruction. The instruction basically just defines duress kind of as a legal matter, and you might think that people, laypeople, might not know what that is. So it could be helpful to tell them. I don't think it's necessary to tell them because why would you anticipate some defense that really wasn't there, wasn't given? Yes, the words were used. I think it's different than the Rodriguez case because it was, this was his entire thing from the beginning. It's his state of mind. Why did he stay in the van in the first place? Why did he walk across the parking lot? Because he was afraid, because Carrillo said he was going to shoot the bus driver. So, you know, there's, if you say you're scared and you did something, then you get an instruction saying, oh, but that doesn't qualify for a real honest to God defense, that's not going to, that's bad. That's, what's the point of that? It was to stack the deck against him even more than it already was with the video evidence. All right. Thank you, counsel. Thank you. U.S. versus Justice is submitted.
judges: NGUYEN, BRESS, Bennett